USDC SCAN INDEX SHEET
Case 3:02-cv-02310-JM-WVG   Document 1   Filed 11/22/02   PageID.1   Page 1 of 14










```
JRL    11/22/02    15:06
3:02-CV-02310    SEC V. CAPPEL
*1*
*CMP.*
```

Glenn A. Harris (Lead Counsel) DC Bar No. 428328
Lawrence A. West
Daniel H. Rubenstein
Neil J. Welch, Jr.
John J. Field III
Nancy E. McGinley
Cory C. Kirchert
Securities and Exchange Commission
450 Fifth Street, NW
Washington, D.C. 20549-0911
(202) 942-7934

Nicolas Morgan (Local Counsel) CA Bar No. 166441
Securities and Exchange Commission
5670 Wilshire Blvd., 11th Floor
Los Angeles, CA 90036-3648
(323) 965-3880

Attorneys for Plaintiff
Securities and Exchange Commission

## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 02 CV 2310 JM (LSP) |
| Plaintiff, | COMPLAINT |
| v. | |
| ILSE CAPPEL, | |
| Defendant. | |

Plaintiff Securities and Exchange Commission (Commission) alleges:

### SUMMARY

1. This case involves a massive financial fraud at Peregrine Systems, Inc., a publicly traded San Diego-based software company. During the fraud, Peregrine filed with the Commission materially false financial statements for at least eleven quarters, covering fiscal years 2000, 2001, and the first three quarters of fiscal 2002. In one portion of the wide-ranging

1  fraud, defendant Ilse Cappel, then the Senior Treasury Manager at Peregrine, engaged with other

2  persons, including Peregrine's Chief Financial Officer, in a scheme to conceal Peregrine's

3  difficulties in collecting its accounts receivable. Those difficulties arose because Peregrine

4  recorded revenue on contingent sales and other non-binding arrangements it entered into with

5  customers. Cappel and the others concealed the accounts receivable problems by, among other

6  things, selling fictitious receivables to banks and improperly accounting for cash collected at

7  quarter end. In addition, while Cappel possessed material nonpublic information about the fraud

8  and the company's true financial condition, she illegally sold more than 15,000 shares of

9  Peregrine stock.

    2.    By engaging in the acts alleged in this complaint, Cappel violated, or aided and abetted Peregrine's violations of, the antifraud, books and records, internal accounting controls, and reporting provisions of the federal securities laws, and unless enjoined by this Court, will continue to do so.

### THE DEFENDANT

    3.    Cappel was employed at Peregrine from 1993 until she left the company in June 2002. Cappel held various positions at Peregrine, including Senior Treasury Manager. Her primary responsibilities included financing accounts receivable, international collections, and forecasting cash and days sales outstanding, or DSO.[1] Cappel is a certified public accountant (on delinquent status for failing to pay license fees) and resides in San Diego, California.

---

[1] DSO is the average number of days it takes a company to collect its accounts receivable. It is an analytical tool used by financial analysts and investors to track the age of a company's aggregate accounts receivable and to assess the quality of a company's receivables and, ultimately, its revenue. The formula for calculating DSO is accounts receivable divided by sales times days in the quarterly or annual period.

COMPLAINT - 2

## THE ISSUER

4. Peregrine, a Delaware corporation with principal offices in San Diego, California, sells infrastructure management software. Its fiscal year ends March 31. From its initial public offering in April 1997 to the present, Peregrine's common stock has been registered with the Commission pursuant to Section 12(g) of the Exchange Act [15 U.S.C. Section 78l(g)]. It traded on the Nasdaq National Market System from its initial public offering until August 30, 2002, when it was delisted. On September 22, 2002, Peregrine filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A, and 27 of the Securities Exchange Act of 1934 (Exchange Act) [15 U.S.C. §§ 78u(d) and (e), 78u-1, and 78aa].

6. Venue properly lies in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Cappel inhabits and transacted business in this judicial district, because offers and sales of the securities at issue in this case took place in this judicial district, and because certain of the acts and transactions constituting the violations in this case occurred within this judicial district.

7. Cappel made use of the means and instrumentalities of interstate commerce in connection with the acts alleged in this complaint.

8. The Commission requests that the Court permanently enjoin Cappel from engaging in further violations; impose civil penalties upon her for participating in the accounting fraud; order Cappel to pay disgorgement, plus prejudgment interest, and civil penalties for

COMPLAINT - 3

insider trading; and order Cappel to disgorge any other ill-gotten gains, plus prejudgment interest.

## PEREGRINE'S ILLUSION OF SUCCESS

9. Following its initial public offering in April 1997, Peregrine reported 17 consecutive quarters of revenue growth through the quarter ended June 30, 2001. During this period, Peregrine's publicly reported financial results met or exceeded analysts' expectations, and the company's stock price increased from $2.25 per share (split-adjusted) to as high as $79.50 per share on March 27, 2000.

10. However, Peregrine's apparently stellar financial results were illusory, and its stock price artificially inflated. Many of its software "sales" that were recorded as revenue did not qualify for revenue recognition under Generally Accepted Accounting Principles (GAAP). Beginning no later than 1999, Peregrine management engaged in a myriad of deceptive sales and accounting practices to create the illusion of growth, including secretly adding material sale contingencies—by oral or written side agreement—to what appeared on their face to be binding contracts.

11. Much of Peregrine's improper revenue recognition occurred in connection with its purported software sales to resellers, also known as "channel partners." Peregrine's written contracts with channel partners typically appeared to bind the channel partners to pay Peregrine. In reality, the channel partners' obligations to Peregrine often were not fixed, but instead were conditioned upon resale to an end-user. Peregrine personnel typically concealed these contingencies in written or oral side agreements. Although Peregrine personnel knew that the company's channel partners had not committed to purchase Peregrine's software, Peregrine nevertheless recorded these transactions as revenue.

12. As a result of these improper revenue recognition practices, during Peregrine's 17 quarters of "growth," the company was accumulating, on its balance sheet, millions of dollars of aging receivables that Peregrine management knew the company would never collect. Large aged accounts receivable were not turning into cash, and as a result DSO and other important indicators of Peregrine's financial health were deteriorating.

## CAPPEL SOLD RECEIVABLES TO BANKS TO LOWER PEREGRINE'S DSO

13. Certain Peregrine personnel understood that the company's customers would not pay invoices generated from contingent sales and that if these purported accounts receivable remained on Peregrine's balance sheet, the company's DSO figure would increase. They also understood that if DSO became too high, securities analysts might suspect that Peregrine had improperly recorded revenue.

14. Peregrine's Chief Financial Officer directed Cappel to remove receivables from Peregrine's balance sheet by selling them to banks at quarter end. Cappel followed the Chief Financial Officer's instruction. Each quarter she calculated the dollar amount of receivables she needed to sell to manage the DSO number down to the target range the Chief Financial Officer had set for her. After Cappel sold the receivables for cash, Peregrine removed them from its balance sheet.[2] This practice, which Peregrine did not properly disclose to investors, reduced the company's DSO to the level the Chief Financial Officer prescribed, and perpetuated the illusion that Peregrine's customers were promptly paying Peregrine.

---

[2] On August 29, 2002, Peregrine announced that its management "believes that the company should have accounted for its accounts receivable factoring arrangements as loans instead of sales of receivables without recourse," and that "previously reported balance sheets will be restated to reflect the loan balances, which were as high as $180 million in past periods."

COMPLAINT - 5

## CAPPEL SOLD FALSE INVOICES TO BANKS

15. As the quarter ended June 30, 1999 came to a close, Peregrine had sold all available receivables but still needed to reduce DSO to make its target. Cappel, the Chief Financial Officer, and certain other Peregrine personnel agreed to prepare invoices for transactions that had not closed, totaling approximately $12 million, and to sell them to a bank. Cappel then sold the bank the "receivables" that the invoices supposedly represented. As it turned out, not all of the contracts closed, leaving Peregrine with a shortfall of several million dollars.

16. In June 2001, Cappel informed the Chief Financial Officer that Peregrine would miss the target DSO number because its receivables were approximately $20 million too high. With the Chief Financial Officer's approval and encouragement, Cappel created a false $19.58 million invoice and sold it to a bank. By selling false receivables to banks, Cappel and other Peregrine personnel caused Peregrine's financial books and records to overstate Peregrine's cash flow, and understate its accounts receivable.

## CAPPEL IMPROPERLY ACCOUNTED FOR QUARTER-END CASH COLLECTIONS

17. Peregrine further falsified its balance sheet and DSO by improperly accounting for cash collected from customers. Peregrine and the banks buying its receivables agreed that even after Peregrine sold the banks the receivables, Peregrine would collect the receivables and then remit payment to the banks within a certain time period. Thus there was generally a permissible lag time between the date Peregrine collected cash and the date Peregrine had to remit payment to the banks. Peregrine's practice was to reduce accounts receivable when Peregrine sold a receivable to a bank. Then, if and when Peregrine collected the receivable, Cappel would reduce accounts receivable again by the amount of the collection. When this

COMPLAINT - 6

practice resulted in Peregrine's holding money at quarter end, Cappel called it the "double dip," because Peregrine had already taken the receivable off its books. In addition, Peregrine would fail to increase accounts payable to reflect its liability to the bank, and would record the cash as its own, instead of holding it in trust as required by the banks.

18.  When the double dip occurred, Peregrine's reported receivables were artificially reduced, cash was artificially increased, and DSO was artificially decreased. In the following quarter, when Peregrine remitted the cash to the banks, Peregrine would reverse the double dip entries. Peregrine double dipped almost every quarter, beginning in September 1999. One of the most egregious examples of the quarter-end double dip occurred in the third quarter of 2002. On December 11, 2001, a Peregrine customer made an early payment of $13.8 million on a receivable that Peregrine had sold to a bank. The payment was not actually due from the customer until February 12, 2002. Although Peregrine's contract with the bank required Peregrine to remit customer payments within two weeks and to hold them in trust, Peregrine did neither. As a result, as Cappel and the Chief Financial Officer knew, Peregrine's reported accounts receivable at quarter end were understated by $13.8 million, as was its liability to the bank.

## CAPPEL SOLD PEREGRINE STOCK DURING THE FRAUD

19.  Between March 17, 1999, and January 2, 2002, Cappel sold 16,249 shares of Peregrine common stock for total proceeds of $334,287, at split-adjusted prices ranging between $14.45 and $30.25 per share. She sold 10,116 of these shares at $14.45 per share on January 2, 2002—just hours before Peregrine preliminarily announced disappointing results for the quarter ended December 31, 2001—for proceeds of $146,176. The announcement of disappointing results was made after the market closed. The following day Peregrine stock closed at $9.26.

practice resulted in Peregrine's holding money at quarter end, Cappel called it the "double dip," because Peregrine had already taken the receivable off its books. In addition, Peregrine would fail to increase accounts payable to reflect its liability to the bank, and would record the cash as its own, instead of holding it in trust as required by the banks.

18.  When the double dip occurred, Peregrine's reported receivables were artificially reduced, cash was artificially increased, and DSO was artificially decreased. In the following quarter, when Peregrine remitted the cash to the banks, Peregrine would reverse the double dip entries. Peregrine double dipped almost every quarter, beginning in September 1999. One of the most egregious examples of the quarter-end double dip occurred in the third quarter of 2002. On December 11, 2001, a Peregrine customer made an early payment of $13.8 million on a receivable that Peregrine had sold to a bank. The payment was not actually due from the customer until February 12, 2002. Although Peregrine's contract with the bank required Peregrine to remit customer payments within two weeks and to hold them in trust, Peregrine did neither. As a result, as Cappel and the Chief Financial Officer knew, Peregrine's reported accounts receivable at quarter end were understated by $13.8 million, as was its liability to the bank.

## CAPPEL SOLD PEREGRINE STOCK DURING THE FRAUD

19.  Between March 17, 1999, and January 2, 2002, Cappel sold 16,249 shares of Peregrine common stock for total proceeds of $334,287, at split-adjusted prices ranging between $14.45 and $30.25 per share. She sold 10,116 of these shares at $14.45 per share on January 2, 2002—just hours before Peregrine preliminarily announced disappointing results for the quarter ended December 31, 2001—for proceeds of $146,176. The announcement of disappointing results was made after the market closed. The following day Peregrine stock closed at $9.26.

But the information Cappel possessed about the fraud was not disclosed in any fashion for nearly four months. On April 30, 2002, after Peregrine closed at $6.85 per share, the company announced that it would delay the release of its fourth quarter and fiscal year financial results. The following day, Peregrine shares closed at $3.45 on volume more than ten times greater than normal. A week later, on May 6, Peregrine announced that based on preliminary information certain transactions involving revenue recognition irregularities, totaling as much as $100 million, had been called into question. The stock closed at $0.89. Nearly four months later, on August 29, Peregrine announced the completion of an investigation conducted by forensic accountants and legal advisors retained by Peregrine's audit committee into accounting irregularities in the company's financial statements for fiscal years 2000, 2001 and the first three quarters of fiscal year 2002. The company further announced that Peregrine management believed that the company would reduce previously recorded revenue by approximately $250 million during the 11-quarter restatement period. After this announcement, the stock closed at $0.27 per share.

20. From 1999 through 2002, Peregrine paid Cappel a base annual salary. She was also paid performance-based bonuses totaling $9,750.

## FIRST CLAIM

### Cappel Violated Exchange Act Section 10(b) and Exchange Act Rule 10b-5
### [Financial Fraud]

21. Paragraphs 1 through 20 are realleged and incorporated herein by reference.

22. Cappel knowingly or recklessly participated in misrepresentations and omissions of fact with the intent of materially misstating Peregrine's publicly reported financial results by selling false receivables to banks and by improperly accounting for quarter-end cash collections.

23. By reason of the foregoing, Cappel violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5[3]].

## SECOND CLAIM

**Cappel Violated Securities Act Section 17(a), Exchange Act Section 10(b) and Exchange Act Rule 10b-5**
[Insider Trading]

24. Paragraphs 1 through 20 are realleged and incorporated herein by reference.

25. Cappel sold Peregrine stock on the basis of material nonpublic information concerning Peregrine's true financial condition, in breach of her fiduciary duty to Peregrine and its shareholders.

26. By reason of the foregoing, Cappel violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## THIRD CLAIM

**Cappel Violated Exchange Act Section 13(b)(5) and Exchange Act Rule 13b2-1 and Aided and Abetted Violations of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B)**
[Books and Records and Internal Controls Violations]

27. Paragraphs 1 through 20 are realleged and incorporated herein by reference.

28. Cappel deliberately circumvented existing internal accounting controls in order to falsify Peregrine's books and records.

29. Cappel, directly or indirectly, falsified or caused to be falsified, books, records, or accounts described in Exchange Act Section 13(b)(2) [15 U.S.C. §§ 78m(b)(2)].

30. Cappel knowingly and substantially participated in a scheme to cause extensive false and misleading entries in Peregrine's books and records. By doing so, Cappel aided and

---

[3] 2001 ed., p. 48, promulgated 12/22/48, as amended 8/11/51.

abetted Peregrine's failure to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the company's transactions and dispositions of its assets.

31. Cappel knowingly and substantially contributed to Peregrine's failure to maintain its internal accounting controls. By doing so, Cappel aided and abetted the company's failure to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP.

32. By reason of the foregoing, Cappel violated Section 13(b)(5) [15 U.S.C. § 78m(b)(5)] and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1[4]] and aided and abetted violations of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

## FOURTH CLAIM

**Cappel Aided and Abetted Violations of Exchange Act Section 13(a) and Rules 12b-20, 13a-1, and 13a-13 thereunder**
**[Reporting Violations]**

33. Paragraphs 1 through 20, and paragraphs 28 through 31, are realleged and incorporated herein by reference.

34. Cappel knowingly and substantially participated in Peregrine's inclusion of financial statements that were not presented in conformity with GAAP in its annual and quarterly reports filed with the Commission from the first quarter of fiscal year 2000 (the period ended June 30, 1999) through the third quarter of fiscal year 2002 (the period ended December 31, 2001).

---

[4] 2001 ed., p. 121, promulgated 2/23/79.

35. By reason of the foregoing, Cappel aided and abetted violations of Exchange Act Section 13(a) [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20[5], 240.13a-1[6], and 240.13a-13[7]].

### RELIEF REQUESTED

WHEREFORE, Plaintiff Securities and Exchange Commission respectfully requests that this Court:

#### I.

Issue an order of permanent injunction restraining and enjoining Cappel, and her agents, servants, employees, attorneys, and assigns, and those persons in active concert or participation with her, and each of them, from violating Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Sections 10(b) and 13(b)(5) [15 U.S.C. §§ 78j(b) and 78m(b)(5)], and Exchange Act Rules 10b-5 [17 C.F.R. § 240.10b-5] and 13b2-1 [17 C.F.R. § 240.13b2-1], and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Exchange Act Rules 12b-20 [17 C.F.R. § 240.12b-20], 13a-1 [17 C.F.R. § 240.13a-1], and 13a-13 [17 C.F.R. § 240.13a-13].

#### II.

Issue an order directing Cappel to disgorge, with prejudgment interest, all ill-gotten gains resulting from her conduct described in this complaint.

---

[5] 2001 ed., p. 100, promulgated 2/13/65.
[6] 2001 ed., p. 116, promulgated 7/24/97.
[7] 2001 ed., p. 119, promulgated 5/12/77, as amended 5/3/83, 7/9/85, 3/13/89, 3/27/92, and 6/14/96.

### III.

Issue an order directing Defendant Cappel to pay civil monetary penalties under Exchange Act Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3) and 78u-1].

### IV.

Grant such other and further relief as this Court may deem just and proper.

Dated: November 21, 2002

Glenn A. Harris (Lead Counsel)
Lawrence A. West
Daniel H. Rubenstein
Neil J. Welch, Jr.
John Field III
Nancy E. McGinley
Cory C. Kirchert
Attorneys for Plaintiff
Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, DC 20549-0911
Telephone:(202) 942-7934 (Harris)
Facsimile:(202) 942-9581

Local Counsel:

Nicolas Morgan
Securities and Exchange Commission
5670 Wilshire Boulevard, 11th Floor
Los Angeles, CA 90036-3648
Telephone: (323) 965-3877
Facsimile: (323) 965-3908

ORIGINAL
BY FAX

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

FILED

sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

I (a) PLAINTIFFS

SECURITIES & EXCHANGE COMMISSION

DEFENDANTS    02 NOV 22 AM 11:44

ILSE CAPPEL

02 CV 2310 JM (LSP)

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   San Diego
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Glenn A. Harris, 450 5th Street, NW,
Washington, D.C., 20549
Phone: 202 942-7934

ATTORNEYS (IF KNOWN)
Michael L. Lipman, 501 W. Broadway, Suite 400
San Diego, CA 92101

II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

[X] 1 U.S. Government Plaintiff   [ ] 3 Federal Question
                                     (U.S. Government Not a Party)

[ ] 2 U.S. Government Defendant   [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX
(For Diversity Cases Only)    FOR PLAINTIFF AND ONE BOX FOR DEFENDANT

|   | PT | DEF |   | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ]1 | [ ]1 | Incorporated or Principal Place of Business in This State | [ ]4 | [ ]4 |
| Citizen of Another State | [ ]2 | [ ]2 | Incorporated and Principal Place of Business in Another State | [ ]5 | [ ]5 |
| Citizen or Subject of a Foreign Country | [ ]3 | [ ]3 | Foreign Nation | [ ]6 | [ ]6 |

IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).
15 USC 77q(a), 15 USC 78j(b) and 78m(b)(5), 15 USC 78m(a), 78m(b)(2)(A) and 78b(b)(2)(B)

V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reapportionment |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 362 Personal Injury- Medical Malpractice | [ ] 620 Other Food & Drug | [ ] 423 Withdrawal 28 USC 157 | [ ] 410 Antitrust |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | | [ ] 625 Drug Related Seizure of Property 21 USC 881 | PROPERTY RIGHTS | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | [ ] 365 Personal Injury - Product Liability | [ ] 630 Liquor Laws | [ ] 820 Copyrights | [ ] 450 Commerce/ICC Rates/etc. |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | [ ] 368 Asbestos Personal Injury Product Liability | [ ] 640 RR & Truck | [ ] 830 Patent | [ ] 460 Deportation |
| [ ] 151 Medicare Act | [ ] 340 Marine | | [ ] 650 Airline Regs | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans) | [ ] 345 Marine Product Liability | PERSONAL PROPERTY | [ ] 660 Occupational Safety/Health | SOCIAL SECURITY | [ ] 810 Selective Service |
| [ ] 153 Recovery of Overpayment of Veterans Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 690 Other | [ ] 861 HIA (1395ff) | [X] 850 Securities/Commodities Exchange |
| [ ] 160 Stockholders Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | LABOR | [ ] 862 Black Lung (923) | [ ] 875 Customer Challenge 12 USC |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 710 Fair Labor Standards Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 195 Contract Product Liability | | [ ] 385 Property Damage Product Liability | [ ] 720 Labor/Mgmt. Relations | [ ] 864 SSID Title XVI | [ ] 892 Economic Stabilization Act |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | [ ] 730 Labor/Mgmt. Reporting & Disclosure Act | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 441 Voting | [ ] 510 Motions to Vacate Sentence Habeas Corpus | [ ] 740 Railway Labor Act | FEDERAL TAX SUITS | [ ] 894 Energy Allocation Act |
| [ ] 220 Foreclosure | [ ] 442 Employment | | [ ] 790 Other Labor Litigation | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/Accommodations | [ ] 530 General | [ ] 791 Empl. Ret. Inc. Security Act | [ ] 871 IRS - Third Party 26 USC 7609 | [ ] 900 Appeal of Fee Determination Under Equal Access to Justice |
| [ ] 240 Torts to Land | [ ] 444 Welfare | [ ] 535 Death Penalty | | | [ ] 950 Constitutionality of State |
| [ ] 245 Tort Product Liability | [ ] 440 Other Civil Rights | [ ] 540 Mandamus & Other | | | [ ] 890 Other Statutory Actions |
| [ ] 290 All Other Real Property | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prisoner Conditions | | | |

VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)

[X] 1 Original Proceeding   [ ] 2 Removal from State Court   [ ] 3 Remanded from Appelate Court   [ ] 4 Reinstated or Reopened   [ ] 5 Transferred from another district (specify)   [ ] 6 Multidistrict Litigation   [ ] 7 Appeal to District Judge from Magistrate Judgment

VII. REQUESTED IN COMPLAINT:   [ ] CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23   DEMAND $   Check YES only if demanded in complaint:  JURY DEMAND: [ ] YES [X] NO

VIII. RELATED CASE(S) IF ANY (See Instructions):   JUDGE Hon. Thomas J. Whelan   Docket Number 02 CR 3104 W

DATE 11/22/02   SIGNATURE OF ATTORNEY OF RECORD
Glenn A. Harris and
Nicholas Morgan

::ODMA\PCDOCS\WORDPERFECT\228161\1 January 24, 2000 (3:10pm):